1   JOSEPH P. RUSSONIELLO (CSBN 44332)
    United States Attorney
2   JOANN M. SWANSON (CSBN 88143)
    Chief, Civil Division
3   MELANIE L. PROCTOR (CSBN 228971)
    Melanie.Proctor@usdoj.gov
4   Assistant United States Attorney

5       450 Golden Gate Avenue, Box 36055
        San Francisco, California 94102-3495
6       Telephone: (415) 436-6730
        FAX: (415) 436-7169
7
    Attorneys for Defendants
8
                    UNITED STATES DISTRICT COURT
9
                  NORTHERN DISTRICT OF CALIFORNIA
10
                         SAN JOSE DIVISION
11
    ZHENG LU,                          )   No. C 08-1569 JF
12                                      )
                      Plaintiff,        )
13                                      )
            v.                          )   GOVERNMENT'S RESPONSE TO THE
14                                      )   ORDER TO SHOW CAUSE
    MICHAEL B. MUKASEY, United States   )
15  Attorney General; et al.,           )
                                        )
16                    Defendants.       )
    _____ )
17

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

RESPONSE TO OSC
C 08-1569 JF

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.  LEGAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

   A.  JURISDICTION AND RELIEF UNDER THE MANDAMUS ACT,
       THE ADMINISTRATIVE PROCEDURE ACT, AND THE
       DECLARATORY JUDGMENT ACT                              . . . . . . . . . 2

   B.  NATURALIZATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       1.  Adjudication of Naturalization Applications . . . . . . . . . . . . . . . . . . . . . 3

       2.  Name Checks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

IV.  ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

   A.  DEFENDANTS MUKASEY AND MUELLER SHOULD BE
       DISMISSED                                              . . . . . . . . . . . . 6

   B.  THE COURT LACKS SUBJECT MATTER JURISDICTION . . . . . . . . . . . . . 7

       1.  The Court Lacks Jurisdiction Under the Mandamus Act
           Because Plaintiff Cannot Establish The Existence of a
           Nondiscretionary, Ministerial Duty                   . . . . . . . . . . . . 7

       2.  The Court Lacks Jurisdiction Under the APA Because Plaintiff
           Cannot Show Action Has Been Unlawfully Withheld or
           Unreasonably Delayed                                 . . . . . . . . 8

       3.  The Court Lacks Jurisdiction Under the Declaratory Judgment
           Act Because Plaintiff Has Failed To Establish An Independent
           Basis For Jurisdiction                               . . . . . . . . 9

   C.  ASSUMING ARGUENDO, AGENCY ACTION HAS NOT BEEN
       UNREASONABLY DELAYED                                     . . . . . . . . 9

       1.  A Rule of Reason Governs the Agency Decisions at Issue . . . . . . . . . . . 9

## TABLE OF CONTENTS (continued)

2.    There Is No Congressionally Mandated Timetable . . . . . . . . . . . . . . . . . 10

3.    The Impact of the Delay is Minimal in Comparison with the
      National Interest in Complete and Thorough Background Checks . . . . . 11

4.    The Effect of Expedition Would Intrude on Agency Discretion and
      Prejudice Other "First In Line" Applicants                      . . . 12

5.    The Agencies are Exercising Every Effort to Address the Delay  . . . . . . 15

V.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

# TABLE OF AUTHORITIES

**FEDERAL CASES**

Alibeik v. Chertoff,
No. C 07-1938 EDL, 2007 WL 4105527 (N.D. Cal. Nov. 16, 2007) . . . . . . . . . . . . . . . 7

Alkenani v. Barrows,
356 F. Supp. 2d 652 (N.D. Tex. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Allied Chemical Corp. v. Daiflon, Inc.,
449 U.S. 33 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Alzuraiki v. Heinauer,
No. 07CV 3189, 2008 WL 413861 (D. Neb. Feb. 13, 2008) . . . . . . . . . . . . . . . . . . 3, 8, 9

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Badier v. Gonzales,
475 F. Supp. 2d 1294 (N.D. Ga. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Boim v. Quranic Literacy Institute,
291 F.3d 1000 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Califano v. Sanders,
430 U.S. 99 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Celotex Corp. v. Cattrett,
477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Cheney v. United States District Court for the District of Columbia,
542 U.S. 367 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Clayton v. Chertoff, et al.,
No. 07-cv-02781-CW, 2007 WL 2904049 (N.D. Cal. Oct. 1, 2007) . . . . . . . . . . . . . . . 6

Cordoba v. McElroy,
78 F. Supp. 2d 240 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Dairi v. Chertoff,
07-cv1014 JM (JMA), 2007 WL 3232503 (S.D. Cal. Nov. 1, 2007) . . . . . . . . . . . . . . 8

**TABLE OF AUTHORITIES (continued)**

**FEDERAL CASES (continued)**

Dmitriev v. Chertoff,
 No. C 06-7677 JW, 2007 WL 1319533 (N.D. Cal. May 4, 2007) . . . . . . . . . . . . . . . . . . 7

Doe v. FBI,
 936 F.2d 1346 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Eldeeb v. Chertoff, et al.,
 No. 07-cv-236-T, 2007 WL 2209231 (M.D. Fla. July 30, 2007) . . . . . . . . 4, 7, 10, 11, 14

Espin v. Gantner,
 381 F. Supp. 2d 261  (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

FBI v. Abramson,
 452 U.S. 615 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Fraga v. Smith,
 607 F.  Supp. 517 (D. Or. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Heckler v. Ringer,
 466 U.S. 602 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

INS v. Miranda,
 459 U.S. 14 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Jiang v. Chertoff,
 No. 08-332 SI, 2008 WL 1899245 (N.D. Cal. Apr. 28, 2008) . . . . . . . . . . . . . . . . . . . 6

Kildare v. Saenz,
 325 F.3d 1078 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 7

Khosravani v. Chertoff,
 No. 08-cv-0220 W, 2008 WL 2047996, at *3 (S.D. Cal. May 13, 2008) . . . . . . . . . . . . 7

Konchitsky v. Chertoff,
 No. C-07-00294 RMW, 2007 WL 2070325 (N.D. Cal. July 13, 2007) . . . . . . . . . . . 7, 13

Li v. Chertoff,
 482 F. Supp. 2d 1172 (S.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**TABLE OF AUTHORITIES (continued)**

**FEDERAL CASES (continued)**

Liberty Fund, Inc. v. Chao,
    394 F. Supp. 2d 105 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 13, 15

Marincas v. Lewis,
    92 F.3d 195 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Mighri v. Gonzales,
    No. 07-03624, 2007 WL 4463590 (E.D. Penn. Dec. 19, 2007) . . . . . . . . . . . . . . . . . . . . 7

Moretazpour v. Chertoff,
    No. 07-4264 BZ, 2007 WL 4287363 (N.D. Cal. Dec. 5, 2007) . . . . . . . . . . . . . . . . . . . . 6

Norton v. So. Utah Wilderness Alliance,
    542 U.S. 55 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Nova Stylings, Inc. v. Ladd,
    695 F.2d 1179 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Pacific Marine Conservation Council, Inc. v. Evans,
    200 F. Supp. 2d 1194 (N.D. Cal. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Patil v. Mueller, et al.,
    No. C 07cv71 JCC, 2007 WL 1302752 (E.D. Va. Apr. 30, 2007) . . . . . . . . . . . . . . . . . 12

Safadi v. Howard,
    466 F. Supp. 2d 696 (E.D. Va. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Saleh v. Ridge,
    367 F. Supp. 2d 508 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

Schilling v. Rogers,
    363 U.S. 666 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Seattle Audubon Soc. v. Moseley,
    80 F.3d 1401 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Sinha v. Upchurch,
    No. 07-CV 2274, 2007 WL 4322225 (N.D. Ohio Dec. 7, 2007) . . . . . . . . . . . . . . . . . . . 8

**TABLE OF AUTHORITIES (continued)**

**FEDERAL CASES (continued)**

Skelly Oil Co. v. Phillips Petroleum Co.,
    339 U.S. 667 (1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Spencer Enterprises, Inc. v. United States,
    345 F.3d 683 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Staacke v. U.S. Department of Labor,
    841 F.2d 278 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Stang v. IRS,
    788 F.2d 564 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Sze v. INS,
    No. C 97-0569 SC, 1997 WL 446236 (N.D. Cal. Jul. 24, 1997) . . . . . . . . . . . . . . . . . . . 12

Tang v. Chertoff,
    No. C 07-0395 JF, 2007 WL 1650938 (N.D. Cal. June 5, 2007) . . . . . . . . . . . . . . . . . . . 6

Telecomm. Research and Action Ctr. v. FCC,
    750 F.2d 70 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11, 12

Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,
    435 U.S. 519 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Walters v. Reno,
    145 F.3d 1032 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Wang v. Mukasey,
    No. 07-6266 RMW, 2008 WL 1767042 (N.D. Cal. Apr. 16, 2008) . . . . . . . . . . . . . . . . . 6

Wright v. Califano,
    587 F.2d 345 (7th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15

Yan v. Mueller,
    No. H-07-0313, 2007 WL 1521732 (S.D. Tex. May 24, 2007) . . . . . . . . . . . . . . . . . . 7, 14

**TABLE OF AUTHORITIES (continued)**

**FEDERAL STATUTES**

Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies
Appropriations Act of 1991,
     Pub. L. 101-515, 104 Stat. 2102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies
Appropriations Act of 1998,
     Pub. L. 105-119, 111 Stat. 2440 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 7, 9, 10

Intelligence Reform and Terrorism Prevention Act of 2004,
     Pub. L. No. 108-458, 118 Stat. 3638 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

5 U.S.C. § 551 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

5 U.S.C. § 552a(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

5 U.S.C. § 701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 8

5 U.S.C. § 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

5 U.S.C. § 706(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 8, 13

6 U.S.C. § 271(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

6 U.S.C. §§ 271(b)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

6 U.S.C. § 551(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

6 U.S.C. § 557 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

8 U.S.C. § 1105(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

8 U.S.C. § 1421(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

8 U.S.C. § 1446 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

8 U.S.C. § 1446(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 8

28 U.S.C. § 1361 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

TABLE OF AUTHORITIES (continued)

**FEDERAL STATUTES (continued)**

28 U.S.C. § 2201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 9

**FEDERAL REGULATIONS**

8 C.F.R. § 335.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

8 C.F.R. § 335.2(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

28 C.F.R. § 20.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

28 C.F.R. § 20.33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Privacy Act of 1974, Notice of Modified Systems of Records,
    63 Fed. Reg. 8 (Feb. 20, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**LOCAL RULES**

Civ. L. R. 7-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**OTHER AUTHORITIES**

The 9/11 Commission Report, 2004 WL 1634382 at 352 (July 22, 2004) . . . . . . . . . . . . . . . . . 11

## I.    INTRODUCTION

Plaintiff Zheng Lu ("Plaintiff") asks the Court to compel Defendants to complete his name check and adjudicate his naturalization application.  However, he has not yet been interviewed on his application.  The U.S. Citizenship and Immigration Services ("USCIS") is mandated by statute to await the results of all background checks before scheduling an interview.  Furthermore, the Federal Bureau of Investigation's ("FBI") Name Check Program is discretionary, and by contract to the requesting agencies.  Accordingly, Plaintiff cannot establish the existence of a nondiscretionary, ministerial duty that is owed to him.  Defendants respectfully submit that Plaintiff's request for relief should not be granted, and that instead, summary judgment should be entered in Defendants' favor.

## II.    FACTUAL BACKGROUND

Plaintiff is a lawful permanent resident of the United States.  Declaration of Janaki Rangaswamy ("Rangaswamy Decl."),¶ 20.  On April 21, 2006, he filed an application for naturalization to United States citizenship.  Id.  His name check was submitted to the FBI on May 12, 2006.  Id.  To date, because his name check remains pending, Plaintiff has not been interviewed on his application.  Id.

The FBI received Plaintiff's name check on May 12, 2006, and electronically checked Plaintiff's name against the FBI's Universal Index on the same date.  See Declaration of Michael Cannon ("Cannon Decl."), p. 17 ¶ 43.  That electronic check resulted in "hits," indicating a possible match with FBI records located in various FBI field offices and/or FBI headquarters.  Id.  A secondary manual search was conducted on October 26, 2006, after which Plaintiff's name still appeared to be associated with FBI records.  Id.  On November 2, 2007, the FBI conducted a preliminary manual file review to locate paper files and determine whether those files are germane to Plaintiff.  Id.  On the same date, his name check was sent to the final stage of the review process, the dissemination phase, where review and analysis of FBI files takes place.  Id.  To date, Plaintiff's name check remains pending.  Id.

On March 21, 2008, Plaintiff commenced this action asserting jurisdiction under  5 U.S.C. §§ 551 et seq. and 701 et seq., 8 U.S.C. § 1446, and 28 U.S.C. §§ 1331, 1361, and 2201. Plaintiff

1  asks this Court to require Defendants to schedule a naturalization interview within sixty days of a

2  Court order, and to award him attorney's fees.  Complaint, p. 4, Prayer for Relief.

### III.    LEGAL BACKGROUND

A.    JURISDICTION AND RELIEF UNDER THE MANDAMUS ACT, THE
ADMINISTRATIVE PROCEDURE ACT, AND THE DECLARATORY
JUDGMENT ACT

Under the Mandamus Act, a court may compel performance of "a duty owed to the plaintiff."

28 U.S.C. § 1361.  Further, "[m]andamus writs, as extraordinary remedies, are appropriate only

when a federal officer, employee, or agency owes a nondiscretionary duty to the plaintiff that is 'so

plainly prescribed as to be free from doubt.'"  Stang v. IRS, 788 F.2d 564 (9th Cir. 1986), quoting

Nova Stylings, Inc. v. Ladd, 695 F.2d 1179, 1180 (9th Cir. 1983).  The United States Supreme Court

has stated that "[t]he common law writ of mandamus is intended to provide a remedy for a plaintiff

only if . . . the defendant owes him a clear nondiscretionary duty."  Heckler v. Ringer, 466 U.S. 602,

616 (1984). The Ninth Circuit has explained that

> [m]andamus . . . is available to compel a federal official to perform a duty only if: (1)
> the individual's claim is clear and certain; (2) the official's duty is nondiscretionary,
> ministerial, and so plainly prescribed as to be free from doubt, and (3) no other
> adequate remedy is available.

Kildare v. Saenz,  325 F.3d 1078,  1084 (9th Cir. 2003).  Mandamus is an extraordinary  remedy.

See Cheney  v. United  States  District Court for the District of Columbia, 542 U.S. 367, 392

(2004)  (Stevens, J., concurring); Allied Chemical Corp. v. Daiflon, Inc., 449 U.S. 33, 34 (1980).

The Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq., does not provide an

independent jurisdictional basis.  Califano v. Sanders, 430 U.S. 99, 107 (1977); Staacke v. U.S.

Department of Labor, 841 F.2d 278, 282 (9th Cir. 1988). Rather, it merely provides the standards

for reviewing agency action once jurisdiction is otherwise established.  Staacke, 841 F.2d at 282.

The Court has jurisdiction over Plaintiff's APA claim "only if §§ 702 and 706(1) of the APA, in

conjunction with the federal question statute, 28 U.S.C. § 1331, provide jurisdiction."  Alzuraiki v.

Heinauer, No. 07CV 3189, 2008 WL 413861, at *2 (D. Neb. Feb. 13, 2008).  Under the APA, a

court may compel an administrative agency to perform an action that has been "unlawfully

withheld" or "unreasonably delayed" by that agency. 5 U.S.C. § 706(1).  A court cannot compel an

agency to take an action it is not lawfully required to take.  <u>Norton v. So. Utah Wilderness Alliance</u>, 542 U.S. 55, 63 (2004).  Finally, the Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201, does not provide an independent basis for jurisdiction; rather, it only expands the range of remedies available in federal courts.  <u>Skelly Oil Co. v. Phillips Petroleum Co.</u>, 339 U.S. 667, 671-72 (1950).

      B.   <u>NATURALIZATION</u>

         1.   <u>Adjudication of Naturalization Applications</u>

The Secretary of the Department of Homeland Security ("DHS") has "sole authority to naturalize persons as citizens of the United States."[1]   8 U.S.C. § 1421(a).  The relevant statutes also provide that "[b]efore a person may be naturalized, and employee of the Service, or of the United States designated by the [Secretary] shall conduct a personal investigation of the person applying for naturalization . . . . "  8 U.S.C. § 1446(a); <u>see also</u> 8 C.F.R. § 335.1 ("Subsequent to the filing of an application for naturalization, the Service shall conduct an investigation of the applicant.  The investigation shall consist, at a minimum, of a review of all pertinent records.").

Before a decision is rendered on an alien's application to naturalize, USCIS conducts several forms of security and background checks to ensure that the alien is eligible for the benefit sought and that she is not a risk to national security or public safety.  <u>See</u> 8 C.F.R. § 335.2(b); Rangaswamy Decl., ¶¶ 5-6.  USCIS also conducts investigations into the bona fides of petitions and applications that have been filed, in order to maintain the integrity of the application process and to ensure that there is no fraud in the application process.  <u>See</u> 8 U.S.C. § 1105(a) (authorizing "direct and continuous liaison with the Directors of the Federal Bureau of Investigation and the Central Intelligence Agency and with other internal security officers of the Government for the purpose of obtaining and exchanging information for use in enforcing the provisions of this chapter in the interest of the internal and border security of the United States").

These checks currently include: (1) an FBI name check, which is run against FBI

---

[1]On March 1, 2003, the Department of Homeland Security and its United States Citizenship and Immigration Services assumed responsibility for adjudication of naturalization applications. 6 U.S.C. § 271(b).  Accordingly, the discretion formerly vested in the Attorney General is now vested in the Secretary of Homeland Security.  6 U.S.C. § 551(d).

RESPONSE TO OSC
C 08-1569 JF                                        3

investigative databases compiled by law enforcement agencies including administrative, applicant, criminal, personnel and other files; (2) an FBI fingerprint check, which provides information relating to criminal background within the United States; and (3) a check against the Interagency Border Inspection System ("IBIS"), which contains records and information from more than 20 federal law enforcement and intelligence agencies, and is used to compile information regarding national security risks, public safety concerns, and other law enforcement concerns. See Rangaswamy Decl., ¶ 6. Congress has mandated that the agency withhold adjudication until the necessary background checks are complete:

> [D]uring fiscal year 1998 and each fiscal year thereafter, none of the funds appropriated or otherwise made available to the Immigration and Naturalization Service shall be used to complete adjudication of an application for naturalization unless the Immigration and Naturalization Service has received confirmation from the Federal Bureau of Investigation that a full criminal background check has been completed . . . .

Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act of 1998 ("1998 Appropriations Act"), Pub. L. 105-119, 111 Stat. 2440, 2448-49. USCIS has implemented this prohibition in its regulations. See 8 C.F.R. § 335.2(b) (providing that an initial examination cannot be scheduled until USCIS receives a definitive response that full criminal background check has been completed).

2.    Name Checks

The FBI's name check process is quite complex. See Eldeeb v. Chertoff, et al., No. 07-cv-236-T, 2007 WL 2209231, at *4 (M.D. Fla. July 30, 2007); Cannon Decl., pp. 2-9 ¶¶ 4-20. The name checks performed by the FBI at the request of USCIS consist of reviews of FBI investigative records from the FBI's Central Records System. See id., p. 2 ¶ 4. When the FBI conducts a name check, the name is checked against the FBI's Universal Index, in a four-stage process. Eldeeb, 2007 WL 2209231 at *3. At each stage of the process, the FBI employs a first-in, first-served protocol. Cannon Decl., p. 8 ¶ 17. However, when an applicant's name check requires a review of numerous FBI records and files, the name check may require additional time until all responsive records are located and reviewed. Id. USCIS determines which name checks are to be expedited. Id., p. 8 ¶ 18; see Rangaswamy Decl., ¶ 16 (setting forth the four criteria for expedition). An expedited name

1    check proceeds to the front of the queue, in front of others awaiting processing.  Cannon Decl.,

2    p. 8 ¶ 17.

3        The FBI's Central Records System includes the investigative records relating to the hundreds

4    of federal violations over which the FBI has investigative jurisdiction, and it includes information

5    on subjects, suspects, victims, witnesses and close relatives and associates who are relevant to an

6    investigation.  See Doe v. FBI, 936 F.2d 1346, 1348 n.2 (D.C. Cir. 1991) (explaining that the Central

7    Records System is the FBI's central filing system, containing the agency's investigative records on

8    various individuals and subject matters).

9        Criminal history record information, such as records of arrests and convictions, is separate

10   and distinct from the raw investigative reports and other types of investigative information contained

11   in the FBI's Central Records System.  Criminal history record information is contained in systems

12   such as the Fingerprint Identification Records System ("FIRS") and the Interstate Identification

13   Index System ("III System"), which is accessible through the National Crime Information Center

14   ("NCIC").  See 28 C.F.R. § 20.3(l)-(n) (defining the FIRS, the III System, and the NCIC,

15   respectively, for purposes of the regulations regarding exchange of criminal history record

16   information); 28 C.F.R. § 20.33 (discussing the dissemination of criminal history record

17   information).

18       The FBI's discretionary authority to release information from its Central Records System

19   is set forth in the routine uses published as part of the Privacy Act Notice for the Central Records

20   System.  See 5 U.S.C. § 552a(b)(3) (allowing dissemination of records pursuant to a published

21   routine use).  One of the routine uses published in the Privacy Act Notice for the Central Records

22   System is that

23          information from this system may be disclosed as a routine use to any Federal
            agency where the purpose in making the disclosure is compatible with the law
24          enforcement purpose for which it was collected, e.g., . . . to assist the recipient
            agency in the performance of any authorized function where access to records in this
25          system is declared by the recipient agency to be relevant to that function.

26   Privacy Act of 1974, Notice of Modified Systems of Records, 63 Fed. Reg. 8,659, 8,682

27   (Feb. 20, 1998) (emphasis added).  Furthermore, in 1990, Congress provided that if the FBI so

28   desired, it could establish and collect fees to process name checks:

for fiscal year 1991 and hereafter the Director of the Federal Bureau of Investigation <u>may</u> establish and collect fees to process fingerprint identification records and name checks for non-criminal justice, non-law enforcement employment and licensing purposes and for certain employees of private sector contractors with classified Government contracts, and notwithstanding the provisions of 31 U.S.C. 3302, credit such fees to this appropriation to be used for salaries and other expenses incurred in providing these services, and that the Director of the Federal Bureau of Investigation <u>may</u> establish such fees at a level to include an additional amount to establish a fund to remain available until expended to defray expenses for the automation of fingerprint identification services and associated costs . . . .

Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act of 1991 ("1991 Appropriations Act"), Pub. L. 101-515, 104 Stat. 2102, 2112 (emphasis added).

On April 2, 2008, USCIS and the FBI announced a joint plan to eliminate the backlog of pending name checks. Rangaswamy Decl., ¶ 9, Exh. 2; Cannon Decl., p. 15 ¶ 39. Logically, the plan focuses on the oldest cases first with a target completion goal of eliminating all name checks which have been pending for more than two years by July 2008. Rangaswamy Decl., ¶ 9, Exh. 2. Under the plan, by June 2009, 98% of all name checks will be processed within thirty days. Id.

## IV.    ANALYSIS

### A.    DEFENDANTS MUKASEY AND MUELLER SHOULD BE DISMISSED

This Court has recognized that since March 1, 2003, the Department of Homeland Security has been the agency responsible for implementing the immigration laws of the United States.[2] <u>Tang v. Chertoff</u>, No. C 07-0395 JF, 2007 WL 1650938, at *3 (N.D. Cal. June 5, 2007); <u>see</u> 6 U.S.C.

_____

[2] Defendants acknowledge recent decisions in this District to the contrary, but respectfully submit that these  minority decisions are in error because those decisions did not consider the discretionary nature of the name check process. <u>See, e.g.</u>, <u>Jiang v. Chertoff</u>, No. 08-332 SI, 2008 WL 1899245 (N.D. Cal. Apr. 28, 2008); <u>Wang v. Mukasey</u>, No. 07-6266 RMW, 2008 WL 1767042 (N.D. Cal. Apr. 16, 2008); <u>Moretazpour v. Chertoff</u>, No. 07-4264 BZ, 2007 WL 4287363 (N.D. Cal. Dec. 5, 2007). Moreover, <u>Moretazpour</u>, on which the other decisions rely, the court suggested that the Department of Homeland Security had, by regulation, imposed a duty upon the FBI to process name checks. <u>Moretazpour</u>, 2007 WL 4287363 at *1. It is doubtful that one agency can create such a duty for another, particularly in light of the discretionary nature of the name check program itself. <u>See</u> 1991 Appropriations Act, Pub. L. 101-515, 104 Stat. 2102, 2112 (stating that the FBI "may" establish a name check program); <u>Pacific Marine Conservation Council, Inc. v. Evans</u>, 200 F. Supp. 2d 1194, 1201 (N.D. Cal. 2002) (describing "may" as discretionary language). Moreover, although the district court also considered Congress' directive in the 1998 Appropriations Act discussed above, it is equally doubtful that Congress intended, in restricting action by one agency, to impose a duty upon another.

§§ 271(b)(5), 557; <u>Alibeik v. Chertoff</u>, No. C 07-1938 EDL, 2007 WL 4105527, at *3 (N.D. Cal. Nov. 16, 2007); <u>Clayton v. Chertoff, et al.</u>, No. 07-cv-02781-CW, 2007 WL 2904049, at *3 (N.D. Cal. Oct. 1, 2007); <u>Konchitsky v. Chertoff</u>, No. C-07-00294 RMW, 2007 WL 2070325, at *6-7 (N.D. Cal. July 13, 2007); <u>Dmitriev v. Chertoff</u>, No. C 06-7677 JW, 2007 WL 1319533, at *4 (N.D. Cal. May 4, 2007). Accordingly, Defendants Mukasey and Mueller have no role in adjudicating Plaintiff's application for naturalization, and the matter should be dismissed as it pertains to them.

Moreover, the FBI's name check program is discretionary, not only in its existence, but in the manner in which the name checks are conducted. 1991 Appropriations Act, Pub. L. 101-515, 104 Stat. 2102, 2112 ; <u>see Yan v. Mueller</u>, No. H-07-0313, 2007 WL 1521732, at *6 (S.D. Tex. May 24, 2007) ("The evidence shows that the delay is due, not only to the volume of requests that the FBI receives, but also to the FBI's <u>exercise of discretion</u> in determining the timing for conducting the many name check requests that it receives and the manner in which to conduct those checks."(emphasis added)). Finally, if any duty is owed, it is owed to USCIS, not Plaintiff. <u>See</u> <u>Eldeeb</u>, 2007 WL 2209231, at *21 (dismissing the FBI, stating that the duty owed by the FBI is to USCIS, not the plaintiff). Accordingly, Defendants Mukasey and Mueller should be dismissed from this action.

B.    <u>THE COURT LACKS SUBJECT MATTER JURISDICTION</u>

1.    The Court Lacks Jurisdiction Under the Mandamus Act Because Plaintiff <u>Cannot Establish The Existence of a Nondiscretionary, Ministerial Duty</u>

Mandamus relief is available only where the plaintiff can establish the existence of a nondiscretionary, ministerial duty. <u>Kildare</u>, 325 F.3d at 1084. Here, Congress has expressly forbidden action on Plaintiff's naturalization application until USCIS receives the full results of his background check. 1998 Appropriations Act, Pub. L. 105-119, 111 Stat. 2440, 2448-49. Because Plaintiff cannot establish the existence of a nondiscretionary, ministerial duty either to examine Plaintiff in the absence of a completed background check, the Mandamus Act does not vest the Court with subject-matter jurisdiction. <u>Kildare</u>, 325 F.3d at 1084; <u>see also</u> <u>Khosravani v. Chertoff</u>, No. 08-cv-0220 W, 2008 WL 2047996, at *3 (S.D. Cal. May 13, 2008) (dismissing action identical to the case at hand for lack of subject matter jurisdiction); <u>Mighri v. Gonzales</u>, No. 07-03624, 2007

1    WL 4463590, at *5 (E.D. Penn. Dec. 19, 2007) (finding the court lacked subject matter jurisdiction

2    over the plaintiff's claim that USCIS should schedule his naturalization interview); <u>Sinha v.</u>

3    <u>Upchurch</u>, No. 07-CV 2274, 2007 WL 4322225, at *3-4 (N.D. Ohio Dec. 7, 2007) (finding that the

4    duty to act on a naturalization application within a reasonable time does not commence until after

5    USCIS receives a completed background check); <u>Dairi v. Chertoff</u>, 07-cv1014 JM (JMA), 2007 WL

6    3232503, at *2 (S.D. Cal. Nov. 1, 2007) (dismissing for lack of subject matter jurisdiction a

7    mandamus action brought to compel adjudication of naturalization application); <u>Badier v. Gonzales</u>,

8    475 F. Supp. 2d 1294, 1299 (N.D. Ga. 2006) (dismissing mandamus action for lack of subject matter

9    jurisdiction where the plaintiff had not yet been interviewed).

10                   2.       The Court Lacks Jurisdiction Under the APA Because Plaintiff Cannot Show
                              <u>Action Has Been Unlawfully Withheld or Unreasonably Delayed</u>
11

12           Plaintiff also asserts that the Court has subject matter jurisdiction pursuant to 28 U.S.C.

13    § 1331 (Federal Question), and 5 U.S.C. § 701 <u>et seq</u>. (APA).  The Ninth Circuit has noted that

14    "agency actions are generally reviewable under federal question jurisdiction, pursuant to 28 U.S.C.

15    § 1331." <u>Spencer Enterprises, Inc. v. United States</u>, 345 F.3d 683, 687 (9th Cir. 2003).  The APA

16    provides the standards of review for agency action.  <u>Id.</u> at 688.  What the APA provides, however,

17    is not unfettered review.

18           The APA allows review only of action "unlawfully withheld or unreasonably delayed."

19    5 U.S.C. § 706(1).   Here, because Congress has specifically forbidden action on Plaintiff's

20    application, he cannot establish that USCIS has either unlawfully withheld or unreasonably delayed

21    action.  1998 Appropriations Act, Pub. L. 105-119, 111 Stat. 2440, 2448-49; Rangaswamy Decl.,

22    ¶ 21.   Moreover, "when Congress intended time limitations on adjudication of naturalization

23    petitions, it expressly created them." <u>Alzuraiki</u>, 2008 WL 413861, at *3; <u>see</u> 8 U.S.C. § 1447(b)

24    (allowing applicant who has not received a decision within 120 days of an examination to seek a

25    hearing on his or her application in the district court).

26           USCIS has acted in accordance with the congressional directive set forth in the 1998

27    Appropriations Act. Rangaswamy Decl., ¶¶ 21-22. Accordingly, the APA, in conjunction with the

28    Federal Question Statute, does not vest the Court with jurisdiction to review his claims.  <u>See</u>

1    *Alzuraiki*, 2008 WL 413861, at *4 ("Because plaintiff fails to allege a legally required duty on the

2    part of the CIS Defendants . . . this Court lacks both APA and mandamus jurisdiction over plaintiff's

3    claims.").

4         3.    The Court Lacks Jurisdiction Under the Declaratory Judgment Act Because
               Plaintiff Has Failed To Establish An Independent Basis For Jurisdiction

5

6         Finally, Plaintiff asserts that jurisdiction exists under the Declaratory Judgment Act, 28

7    U.S.C. § 2201.  It has long been held that "the availability of such relief presupposes the existence

8    of a judicially remediable right." Schilling v. Rogers, 363 U.S. 666, 677 (1960).  The Ninth Circuit

9    has explained that "where jurisdiction exists, the Act is intended to allow earlier access to federal

10   courts in order to spare potential defendants from the threat of impending litigation." Seattle

11   Audubon Soc. v. Moseley, 80 F.3d 1401, 1405 (9th Cir. 1996).  Here, because Plaintiff has not

12   otherwise established jurisdiction under, the DJA does not confer jurisdiction. Li v. Chertoff, 482

13   F. Supp. 2d 1172, 1179 (S.D. Cal. 2007).[3]

14   C.    ASSUMING  ARGUENDO,  AGENCY  ACTION  HAS  NOT  BEEN
           UNREASONABLY DELAYED

15

16        Assuming arguendo, and the Court determines that it has subject matter jurisdiction, Plaintiff

17   has failed to establish the existence of an unreasonable delay.  To determine whether a delay is

18   egregious, such that relief under the APA is warranted, several circuits have adopted the six-part test

19   first articulated in Telecomm. Research and Action Ctr. v. FCC, 750 F.2d 70, 80 (D.C. Cir. 1984)

20   ("TRAC").

21        1.    A Rule of Reason Governs the Agency Decisions at Issue

22        The first TRAC factor requires an agency to govern decisions with a rule of reason. TRAC,

23   750 F.2d at 80.  Given the large volume of petitions and applications requiring adjudication, the

24   extensive background check that is required for national security and public safety, and the limited

25   resources available to it, the FBI is proceeding in an orderly fashion with the completion of name

26

27

28        [3]Plaintiff also seeks attorney's fees. Complaint, Prayer for Relief. This request is premature,
     and only relevant should Plaintiff prevail on his claims.  Accordingly, Defendants reserve their
     arguments on this claim for a later date.
     RESPONSE TO OSC
     C 08-1569 JF                    9

1   checks in the order in which they are received. <u>See</u> <u>Eldeeb</u>, 2007 WL 2209231, at *2. Once the FBI

2   name check in this case has been completed, USCIS will promptly proceed on Plaintiff's

3   application. Rangaswamy Decl., ¶ 22. Further, USCIS regularly monitors the case to determine

4   whether the name check remains pending. <u>Id.</u>, ¶ 13. Public safety requires USCIS to make certain

5   that the background checks have been completed and any outstanding issues resolved before it

6   reaches a decision. <u>Id.</u>, ¶ 5. Most importantly, as explained in the Cannon Declaration, Plaintiff's

7   name check has entailed a lengthy research process of investigatory records. Cannon Decl., p. 17

8   ¶ 43. In Plaintiff's case, this means that USCIS must await the results of the FBI name check before

9   scheduling him for an examination, and the FBI must be given time to perform an accurate and

10  thorough check. Rangaswamy Decl., ¶¶ 6-11.

11                  2.      <u>There Is No Congressionally Mandated Timetable</u>

12          The second <u>TRAC</u> factor does not apply to the present case because Congress has mandated

13  that USCIS not adjudicate before receiving the results of the full background check. 1998

14  Appropriations Act, Pub. L. 105-119, 111 Stat. 2440, 2448-49. Moreover, Congress has clearly

15  demonstrated that where it desires time limits on the processing of name checks, it knows how to

16  set them. <u>See</u> Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458,

17  § 3001(g), 118 Stat. 3638 (2004) (requiring Government personnel security checks to be completed

18  within a certain time frame).

19          Where there are no statutory guidelines, and in order to establish a "rule of reason," the

20  courts must consider the factors that contribute to the backlogs that both the FBI and USCIS face.

21  <u>See, e.g.</u>, <u>INS v. Miranda</u>, 459 U.S. 14, 18 (1982) ("Both the number of the applications received

22  by the INS and the need to investigate their validity may make it difficult for the agency to process

23  an application as promptly as may be desirable"). In making a request for immigration benefits,

24  "aliens only have those statutory rights granted by Congress," <u>Marincas v. Lewis</u>, 92 F.3d 195, 203

25  (3d Cir. 1996), and no federal statute or regulation prescribes a hard-and-fast deadline for acting

26  upon immigration applications, such as the ones in this case, submitted to the USCIS. <u>See</u> <u>Cordoba</u>

27  <u>v. McElroy</u>, 78 F. Supp. 2d 240, 244 (S.D.N.Y. 2000).

28          As discussed in <u>Eldeeb</u>, the FBI name check is a complex process. <u>Eldeeb</u>, 2007 WL

2209231, at *2.  It involves a check of a variety of sources, and although most name checks are resolved in a matter of hours, approximately 32 percent require additional, manual review. Id., at *2.  Of those remaining checks, 22 percent are returned within two months.  Id.  The FBI processes name checks chronologically, based on the date the name check is submitted.  Id.

Before September 11, 2001, the FBI processed approximately 2.5 million name checks per year, checking only the "main" files.  Id. at *3.  In Fiscal Year 2006, the FBI processed over 3.4 million name checks.  Id.  In addition, the FBI began checking "reference" files.  Id.  This expansion of the name check procedures prompted USCIS, in December 2002 and January 2003, to resubmit 2.7 million name check requests, for those with pending applications for immigration benefits.  Id. at *4.  The FBI is currently still working to resolve 440,000 of these resubmitted name checks; because the FBI processes name checks chronologically, the processing of regular name checks has been delayed.  Id.  Name checks that exceed the two month window require personal attention of the processing agent.  Id. at *5.  The FBI currently processes approximately 340,000 name checks per year by hand.  Id.  Thus, it is evident that there are substantial factors contributing to the backlog.

3.    The Impact of the Delay is Minimal in Comparison with the National Interest in Complete and Thorough Background Checks

The third TRAC factor is the delay's impact on human health, welfare, and economic harm to Plaintiff.  This factor's analysis overlaps with the analysis of the fifth TRAC factor, the nature and extent of the interests prejudiced by the delay.  TRAC, 750 F.2d at 80; Liberty Fund, Inc. v. Chao, 394 F. Supp. 2d 105, 118 (D.D.C. 2005).  Plaintiff may be inconvenienced by the delay in adjudication, but this individual interest cannot outweigh Defendants' interests in fully and accurately completing each name check.  Security background checks for individuals seeking immigration benefits is a key component to our nation's national security.  See The 9/11 Commission Report, 2004 WL 1634382 at 352 (July 22, 2004) (finding that, "had the immigration system set a higher bar for determining whether individuals are who or what they claim to be....it could have potentially have excluded, removed, or come into further contact with several hijackers who did not appear to meet the terms for admitting short-term visitors.").

1    In most cases, the adverse impact caused by the delay is not substantial.  Applicants for

2    naturalization who have pending applications retain all of the rights and benefits of a permanent

3    resident of the United States, including the right to live and work in this country and travel freely

4    abroad. Rangaswamy Decl., ¶ 19.  Even when a more substantial impact is felt by an applicant, this

5    impact, "is unlikely to rise to the level that would significantly change the Court's assessment of the

6    unreasonableness of the delay in light of the importance of the agency's competing priorities."

7    Liberty Fund, 394 F. Supp. 2d at 118.  As the highest of priorities, "our national security requires

8    that caution and thoroughness in these matters not be sacrificed for the sake of expediency."  Safadi

9    v. Howard, 466 F. Supp. 2d 696, 701 (E.D. Va. 2006).  Although a delay in processing may have

10   a negative impact, "nevertheless, in this post-9/11 context, agencies must have the freedom to

11   carefully and thoroughly investigate these applications without judicial interference in their

12   priorities." Patil v. Mueller, et al., No. C 07cv71 JCC, 2007 WL 1302752 at *2 (E.D. Va. Apr. 30,

13   2007) (holding that the Court had no jurisdiction to issue a writ of mandamus due to legal and policy

14   considerations).  Thus, when balancing the agencies' interests in defending against threats to

15   national security against the Plaintiff's interest in adjudication, the interests of the nation must

16   prevail.

17          4.      The Effect of Expedition Would Intrude on Agency Discretion and
                    Prejudice Other "First In Line" Applicants

18

19          The court in Sze v. INS, No. C 97-0569 SC, 1997 WL 446236, at *8 (N.D. Cal.

20   Jul. 24, 1997), which applied the TRAC test to a similar complained-of delay in the immigration

21   context, found the fourth factor to be the most persuasive.  Id. at *8.  The court, in refusing to grant

22   relief under the APA, held that "the reasonableness of administrative delays must be judged in light

23   of the resources available to the agency."  Id.  The court also recognized that by granting relief, it

24   "would, at best, reorder the queue of applications, thereby leading to little net benefit." Id.; see also

25   Liberty Fund, 394 F. Supp. 2d at 117 (deferring to agency's decision on how to handle competing

26   applications for permanent labor certifications).

27          In Liberty Fund, the court refused to grant mandamus relief where it was requested solely

28   due to the length of the delay in processing alien labor certifications.  394 F. Supp. 2d at 115.

1    Applying the <u>TRAC</u> factors, the court held that without a statutory timetable governing agency

2    action, the <u>TRAC</u> factor, "that weighs most heavily under the circumstances of the case is the fourth

3    factor - the effect of granting relief on the agency's competing priorities." <u>Id.</u> at 116.  The court

4    reasoned that the agency's "first in, first out processing" was deserving of deference because any

5    grant of relief to petitioners would result in no net gain - petitioners would move to the front of the

6    queue at the expense of other similarly situated applicants.  After examining the agency's priorities,

7    growing workload, and good faith efforts to alleviate the delays, the court concluded that mandamus

8    relief was not warranted.  <u>Id.</u> at 119.

9         Just as in <u>Liberty Fund</u>, Plaintiff's argument of unreasonable delay in this case must also fail.

10   Plaintiff asks this Court to find that USCIS has not adjudicated his naturalization application in a

11   reasonable period of time.  Plaintiff's legal arguments under 5 U.S.C. § 706(1) fail because

12   adjudication has not been unreasonably delayed.  Contrary to Plaintiff's pleadings, the existence of

13   administrative delays does not mean that such delays are unreasonable.  Courts have noted that "the

14   reasonableness of such delays must be judged in light of the resources that Congress has supplied

15   to the agency for the exercise of its functions, as well as the impact of the delays on the applicants'

16   interests." <u>Fraga v. Smith</u>, 607 F. Supp. 517, 521 (D. Or. 1985) (citing <u>Wright v. Califano</u>, 587 F.2d

17   345, 353 (7th Cir. 1978)).  Indeed, "[t]he passage of time alone is rarely enough to justify a court's

18   intervention in the administrative process." <u>Fraga</u>, 607 F. Supp. at 521.

19        Similarly, the effect of expediting delayed agency action under the fourth <u>TRAC</u> factor

20   would unquestionably impinge upon agency activities and responsibilities of a higher priority.  Such

21   an order would intrude on the agency's discretion and ability to fulfill its highest priority of

22   safeguarding the nation.  See <u>Boim v. Quranic Literacy Institute</u>, 291 F.3d 1000, 1027 (7th Cir.

23   2002) ("the government's interest in preventing terrorism is not only important but paramount"); <u>see</u>

24   <u>also</u> <u>Walters v. Reno</u>, 145 F.3d 1032, 1043 (9th Cir. 1998) ("The Government's interests in the

25   administration of its immigration laws and in preventing [immigration related] document fraud are

26   likewise considerable.").  The Court should decline to interfere with discretion of the FBI to set

27   priorities for processing background checks.  <u>See, e.g.</u>, <u>Konchitsky</u>, 2007 WL 2070325, at *6-7

28   (stating "courts squarely addressing the issue of whether they have jurisdiction to compel the FBI

1    to perform name checks . . . have overwhelmingly concluded that they do not."); Yan, 2007 WL

2    1521732, at *6 ("The evidence shows that the delay is due, not only to the volume of requests that

3    the FBI receives, but also to the FBI's exercise of discretion in determining the timing for

4    conducting the many name check requests that it receives and the manner in which to conduct those

5    checks." (emphasis added)).  Furthermore, as recognized by the district court in Eldeeb, the fact the

6    majority of cases are processed within a lesser time frame "suggests that . . . the requests without

7    results after six months are so because those particular Name Check requests require more time to

8    investigate." Eldeeb, 2007 WL 2209231, at *5.

9        Indeed, as set forth in the Cannon Declaration, Plaintiff's name check falls squarely into this

10   category of cases.  Cannon Decl., p. 17 ¶ 43.  The FBI has been diligently processing Plaintiff's

11   name check since the date it was received.  Id. (setting forth benchmark dates for the processing of

12   Plaintiff's name check).  Because this process involves a review of investigatory records, Plaintiff

13   is not entitled to know the particularized details of this, or any, law enforcement investigation. FBI

14   v. Abramson, 456 U.S. 615, 631-32 (1982) (holding that "information initially contained in a record

15   made for law enforcement purposes continues to meet the threshold requirements of [5 U.S.C.

16   § 552(b)(7)] where that recorded information is reproduced or summarized in a new document

17   prepared for a non-law-enforcement purpose.").

18       Delays in the processing of FBI name checks arise for a variety of reasons.  First, USCIS is

19   not the only agency that engages in the FBI name check program.   Notably, the FBI and USCIS

20   processes' do not occur in vacuums.  Any requirement that the FBI or USCIS process Plaintiff's

21   name check or application within a particular time limit will have the unfortunate side effect of

22   slowing the processing for other applicants who are also awaiting action on their applications for

23   immigration benefits.  Here, Plaintiff's application is under initial processing at the California

24   Service Center ("CSC").  See Rangaswamy Decl., ¶ 2.  In Fiscal Year 2007, the CSC received

25   401,050 naturalization applications, and completed initial processing of 227,165 naturalization

26   applications.  Id., ¶ 3.

27       Courts have been cautioned against "engrafting their own notions of proper procedures upon

28   agencies entrusted with substantive functions by Congress."  Vermont Yankee Nuclear Power Corp.

1   v. Natural Resources Defense Council, Inc., 435 U.S. 519, 525 (1978). Here, where "there are no

2   allegations of bad faith, a dilatory attitude, or a lack of evenhandedness on the part of the agency,

3   the reasonableness of the delays in terms of the legislatively imposed 'reasonable dispatch' duty

4   must be judged in light of the resources that Congress has supplied, as well as the impact of the

5   delays on the applicants' interests." Wright, 587 F.2d at 353. The complexity of agency

6   investigations, as well as the extent that the individual applicants contributed to delays, also enter

7   into a court's deliberations. See Saleh v. Ridge, 367 F. Supp. 2d 508, 512 (S.D.N.Y. 2005). Setting

8   a time frame on adjudication of Plaintiff's application would interfere with USCIS's ability to fully

9   investigate the name check response, if necessary. Rangaswamy Decl., ¶¶ 8, 10.

10              5.      The Agencies are Exercising Every Effort to Address the Delay

11          The sixth and last TRAC factor provides that a court need not find impropriety to hold that

12  an agency action is unreasonably delayed. Conversely, "the good faith of the agency in addressing

13  the delay weighs against mandamus." Liberty Fund, 394 F. Supp. 2d at 120. Here, the delay is due

14  to the pendency of Plaintiff's FBI name check. See Rangaswamy Decl.,¶ 21. As discussed above,

15  the FBI is processing the name checks to the best of its ability, and USCIS is monitoring the case

16  to ensure that once the name check is complete, USCIS can complete adjudication. Moreover,

17  USCIS and the FBI recently announced a plan to address the backlog in name checks. Id., Exhibit

18  1; Cannon Decl., p. 15 ¶ 39. It appears that under this joint plan, Plaintiff's name check will be

19  completed by July 2008. Rangaswamy Decl., Exh. 1; Cannon Decl., p. 15 ¶ 39. In addition, the FBI

20  is taking steps to address the factors that contribute to delays in processing name checks. Cannon

21  Decl., pp. 12-14 ¶¶ 30-37. These measures include developing an electronic repository for name

22  checks, applying contractor resources to "single hit" requests, hiring additional employees and using

23  overtime to maximize productivity, scanning paper files required for review, and exploring

24  automation of the name check process. Id. Thus, balancing the TRAC factors demonstrates the

25  reasonableness of the Government's actions.

26          In addition, Plaintiff has failed to show that USCIS will refuse to adjudicate his application

27  once the FBI completes the requisite name check. See Saleh, 367 F. Supp. 2d at 513; see also

28  Eldeeb, 2007 WL 209231, at *17 (finding that the plaintiff had failed to show that USCIS was

1    refusing to act on his application).  On the contrary, the FBI and USCIS are taking active steps

2    towards completing the background checks for adjudication of his application.  Specifically, USCIS

3    is making every effort to complete adjudication as soon as the name check is completed.

4    Rangaswamy Decl.,¶ 22.

5         Many courts have refused to grant relief under the APA, even when naturalization or other

6    immigration applications were pending for significant time periods.  See Saleh, 367 F. Supp. 2d at

7    513 (finding five-year delay not in violation of APA in part in light of volume of applications);

8    Espin v. Gantner, 381 F. Supp. 2d 261, 266 (S.D.N.Y. 2005) (over three-year delay not unreasonable

9    because of government's limited resources and substantial caseload); Alkenani v. Barrows, 356 F.

10   Supp. 2d 652, 656-57 (N.D. Tex. 2005) (no unreasonable delay found in naturalization context

11   because of need to wait for completion of FBI investigation).  Just as in these cases, Plaintiff in the

12   present case insist that this Court find an unreasonable delay based solely on the amount of  time

13   passed since receipt of his application.  However, the law requires a more in-depth analysis for

14   mandamus relief under the APA.  A review of the six TRAC factors shows that Defendants have not

15   unreasonably delayed actions pertaining to Plaintiff's naturalization application.

## V.    CONCLUSION

17        For the foregoing reasons, Defendants submit that Plaintiff's request for relief should not be

18   granted.  Instead, Defendants respectfully ask the Court to dismiss Plaintiff's Complaint for lack of

19   subject-matter jurisdiction.  In the alternative, Defendants respectfully ask the Court to find that the

20   delay has not been unreasonable, and grant summary judgment in their favor.

21   Dated: May 30, 2008                          Respectfully submitted,

22                                                JOSEPH P. RUSSONIELLO
                                                  United States Attorney
23

24                                                _____/s/_____
25                                                MELANIE L. PROCTOR
                                                  Assistant U.S. Attorney
26                                                Attorneys for Defendants

27

28

1   JOSEPH P. RUSSONIELLO (CSBN 44332)
    United States Attorney
2   JOANN M. SWANSON (CSBN 88143)
    Chief, Civil Division
3   MELANIE L. PROCTOR (CSBN 228971)
    Melanie.Proctor@usdoj.gov
4   Assistant United States Attorney

5        450 Golden Gate Avenue, Box 36055
         San Francisco, California 94102-3495
6        Telephone: (415) 436-6730
         FAX: (415) 436-7169
7
    Attorneys for Defendants
8
                    UNITED STATES DISTRICT COURT
9
                  NORTHERN DISTRICT OF CALIFORNIA
10
                          SAN JOSE DIVISION
11
    ZHENG LU,                      )      No. C 08-1569 JF
12                                 )
                    Plaintiff,     )
13                                 )
         v.                        )      DECLARATION OF JANAKI
14                                 )      RANGASWAMY
    MICHAEL B. MUKASEY, United States )
15  Attorney General; et al.,      )
                                   )
16                  Defendants.    )
17  _____)

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF JANAKI RANGASWAMY

I, JANAKI RANGASWAMY declare as follows:

1. I am employed by the United States Citizenship and Immigration Services (hereinafter "USCIS") as Supervisory Center Adjudications Officer (SCAO), at the California Service Center (CSC) in Laguna Niguel, California. I have been employed as an SCAO since November 2005 and have been employed in other capacities by the agency since May 1992. I am currently the supervisor of the N-400 unit which is responsible for overseeing the intake processing of N-400 Applications for Naturalization from initial receipt of the application by the CSC through the receipt of FBI name check clearances and scheduling the naturalization examination or interview in the USCIS district or field office where the applicant resides.

2. This declaration is submitted in support of Defendants' Opposition to Granting Relief in the case of <u>Lu v. Chertoff</u>, CV 08-01569,  currently pending in the Northern District of California.  This declaration provides a factual summary of the agency's adjudication policy as well as a review of the plaintiff's file. As Supervisor of the N-400 unit at CSC, I am in charge of the team that monitors and oversees the intake processing of the N-400 application for naturalization involved in this litigation. The information below is based upon review of the files, electronic records, personal knowledge, and other information that has become known to me in the course of my official responsibilities concerning the processing of this application.

3. The CSC is responsible for the receipt, processing and adjudication of certain immigrant and nonimmigrant visa petitions and other applications filed by petitioners and applicants residing in the western United States as well certain forms and petitions transferred from other Service Centers. The CSC averages 115,915 completions per month, including the receipt of and initial processing of N-400s prior to their transfer to local district offices.

During Fiscal Year 2007 the CSC oversaw the initial receipt of 401,050 N-400s for an average of 33,421 per month and completed the initial processing of 227,165 N-400s.

4.    There are four Service Centers throughout the United States, each of which has jurisdiction over certain types of applications and petitions either filed within their respective geographic areas or assigned to them as part of a national bi-specialization effort.  The four Service Centers combined average 387,776 receipts per month, or 4,265,536 in the last eleven months.  Some Service Centers are the sole adjudicators of certain types of petitions; for instance the Nebraska Service Center adjudicates all refugee adjustment applications and all NAFTA applications, whereas the Vermont Service Center adjudicates all battered spouse applications.  The Service Centers fulfill part of the USCIS responsibility to adjudicate benefits applications and are allocated part of the USCIS adjudication resources.  In order to maximize productivity, the Service Centers have no public interface and process and adjudicate only petitions and applications that do not require personal interviews.  Additionally, Service Centers do initial receipt, file creation, security clearances and processing of some petitions and applications that do require personal interviews prior to their relocation to USCIS District Offices.  This includes Form N-400, Application for Naturalization, and Form I-589, Application for Asylum and for Withholding of Removal.

5.    When a visa petition or other application seeking an immigration benefit on behalf of an alien is filed with USCIS, the agency conducts numerous mandatory criminal and national security background checks.  These checks are conducted both to enhance national security and ensure the integrity of the immigration process.  These security and background checks serve to screen out aliens who may seek to harm the United States and its citizens or who may be seeking immigration benefits improperly or fraudulently.  These security checks have yielded significant derogatory information about alien applicants involved in violent crimes, sex crimes, crimes against children, drug trafficking and individuals with known links to terrorism.  This has resulted in the alien

being found ineligible for the immigration benefit and USCIS's denial of the application or petition. Where applicable, the information has also resulted in aliens being arrested by law enforcement agencies or charged under removal grounds and deported from the United States.

6.    The attached Fact Sheet explains the different types of checks that must be completed. (See Fact Sheet, dated April 25, 2006, a true and correct copy of which is attached hereto as Exhibit 1). The checks include the FBI Name Check, FBI fingerprint check, and the DHS-managed Interagency Border Inspection System (IBIS). The records maintained in the FBI name check process consist of administrative, applicant, criminal, personnel and other files compiled by law enforcement agencies that contain information that is not necessarily revealed by the FBI's fingerprint check or IBIS. Although in the majority of FBI name checks no matches are found, some cases involve complex or highly sensitive information and cannot be resolved quickly. The IBIS system contains records and information from more than 20 federal law enforcement and intelligence agencies including the Central Intelligence Agency (CIA), FBI and other divisions of the U.S. Department of Justice, the Department of State, DHS Customs and Border Protection (CBP) and other DHS agencies. It is a multi-agency effort with a central system that combines information from these various sources and databases to compile information regarding national security risks, public safety concerns, and other law enforcement concerns. IBIS provides, but is not limited to, information related to persons who are wanted criminals, persons of interest in the context of national security, and other derogatory information, including adverse immigration history. While the results of an IBIS query are usually available immediately, in some cases information found will require further investigation. Finally, FBI fingerprint checks provide information relating to criminal background within the United States. Results are usually received within days and while the vast majority result in no criminal record, positive results may have a direct bearing on the eligibility of an applicant for the

immigration benefit being sought.

7.    The FBI has an established process of processing FBI Name Check requests from USCIS chronologically based on the date the request is forwarded.  Since September 11, 2001, USCIS has submitted millions of name check requests to the FBI, thus taxing that agency's resources and creating a backlog in FBI's performance of complete security checks.  During the initial submission period of December 2002 and January 2003, USCIS submitted almost 3 million names to the FBI.  As of May 2007, USCIS had approximately 329,160 pending FBI Name Check requests with approximately 32 percent pending more than one year.

8.    Since the terrorist attacks of September 11, 2001, the need to conduct more rigorous and thorough background checks on aliens who are seeking immigration status in the United States has required procedures that sometimes result in individuals not receiving their documents and benefits as quickly as in the past.  In order to ensure national security and public safety, as well as to reduce the waiting time for adjudication and documentation of lawful status, USCIS is currently working with DOJ, DHS, and ICE to develop and implement improved procedures that will ensure that all of the background checks are completed and the results considered as quickly as possible.  However, the public safety requires USCIS to make certain that the checks have been done before it adjudicates any application or petition and before it issues any immigration status documents to such persons.  Accordingly, pursuant to established agency policy, all required security checks must be completed prior to adjudication of the application.

9.    On April 2, 2008 USCIS and the FBI announced a joint plan to eliminate the backlog of name checks pending with the FBI.  Under this plan, a increase of staff and an expansion of resources, as well as an application of new business processes, are geared to accomplishing the goal of completing 98% of all name checks within 30 days, and the resolution of the remaining 2% of name checks (difficult cases requiring more time) within 90 days or less.  The joint plan will focus on the elimination of the oldest cases

first with a target completion goal of elimination of all name checks pending for more than two years by July 2008 and those pending more than one year by November 2008. (See Press Release, dated April 2, 2008, a true and correct copy of which is attached hereto as Exhibit 2).

10.    For most applicants, USCIS can quickly determine if there are criminal or security related issues in the applicant's background that affect eligibility for immigration benefits. However, due both to the sheer volume of security checks USCIS conducts, and the fact that USCIS must await responses from the FBI or other relevant agencies that conduct some of the required security checks, some delays on individual applications are unavoidable and may be lengthy. Moreover, in some cases a background or security check will reveal that positive (derogatory) information on the subject alien is possessed by some agency other than USCIS without necessarily revealing the substance of that information. In such cases, USCIS works closely with the other law enforcement or intelligence agencies to obtain all available information concerning the positive result in order to properly evaluate its significance. Even where the FBI or a third agency has provided a final response, a case may still be considered pending where the response requires further investigation or review by USCIS or another agency. It is vitally important to thoroughly screen each applicant in order to resolve all concerns of a law enforcement or national security nature before determining that an individual is eligible for an immigration benefit.

11.    USCIS will continue to perform any outstanding background and security checks as expeditiously as possible to ensure that no eligible alien must wait longer than is reasonably necessary to receive a decision on his or her application or petition and to receive evidence of his or her immigration status.

12.    Since only aliens who are lawful permanent residents may apply for naturalization, all applicants for naturalization already have a previously created permanent immigration file (A-file) which houses their application for permanent residence and related files.

Once USCIS receives an N-400 Application for Naturalization, the application is keyed in, placed into a receipt folder, a T-file (temporary file) is created and the A-file is requested electronically through the Central Immigration System ("CIS"). The T-file is placed on an N-400 shelf until the A-file is received and the N-400 is then consolidated into the permanent A-file. Much of this initial electronic processing and data entry is automated, including the automatic generation and electronic transmission of a FBI name check request by the CLAIMS 4 (Computer Linked Access Information Management System) via FBIQUERY, the FBI repository and tracking system for FBI Name Check requests. That electronic transmission of the FBI name check request by CLAIMS 4 is done automatically when the N-400 is first received and keyed in at the Service Center and before the N-400 is placed on the N-400 shelf to await completion of all necessary security checks, including the FBI name check, and request by the local USCIS district offices for transfer of N-400s ready for interview and adjudication. N-400s are separated on the N-400 shelf by local district offices in accordance with the geographic location of the applicant and generally in chronological order according to date of receipt.

13.    The FBI Name Check Quality Assurance desk of USCIS Service Center Operations issues a report to the CSC once or twice a month to identify N-400 applications that have received a "No Data" or "Error" response indicating a problem with transmission of the name check request from USCIS to the FBI. If such a problem is reported, the FBI name check requests will then be initiated a second time and resent manually or electronically to the FBI for a response. In this way USCIS ensures that the FBI has in fact received all requests for name checks. Additionally, the CSC N-400 unit runs C4 Workflow Current Activity Report monthly or more often as needed. In addition to other queries, this report identifies those cases queries those N-400 applications pending at the CSC which have an FBI name check response "ERROR". If more than 60 days have elapsed since the FBI response date, then these cases are entered into a spreadsheet and re-submitted to the FBI. The CSC also runs a RAFACS report approximately at least every other month that

audits or "sweeps" all pending N-400s located at the CSC to determine the current status and to identify and resolve any problems. This report is reviewed to ensure that all necessary fingerprints and security checks, including the FBI name check, have been transmitted properly. FBI name check requests that have been received by the FBI but have not yet been completed are indicated by a notation of "Pending". An FBI Name Check that has been completed will be indicated by various entries depending on the result, including No Record, Positive Record, etc.

14. These reports do not provide USCIS with any information as to what information the FBI may have relating to a particular alien, whether an FBI investigation into the particular alien has been undertaken, or whether there are national security concerns relating to that alien. Once a response is received from the FBI, that information is automatically uploaded in CLAIMS 4. Once the FBI name check and other security checks are completed, CLAIMS 4 automatically moves the N-400 into an interview queue. The N-400s then remain in the interview queue to await scheduling of interviews by the district offices. District Offices request the transfer of N-400s from the CSC from the interview queue by a "pick list" in accordance with their available adjudication resources and workload. Once an N-400 is requested by a district office the file is pulled by a contractor and is transferred to the district office in time for interview and adjudication there.

15. USCIS has a process for expediting processing of certain applications and petitions. It is important to note that whenever a particular application or petition receives expedited processing and is moved up in the adjudications queue, it is at the expense of those still unadjudicated petitions or applications that bear an earlier filing date. If, for example, USCIS asks the FBI to expedite a name check in a particular case, this action comes at the expense of other name check cases because the FBI would have fewer resources with which to work other pending cases.

16.    In order to address in a consistent and fair manner the increasing number of mandamus actions filed nationwide by aliens awaiting decisions on their petitions and applications, USCIS issued specific guidelines for requesting an expedited name check from the FBI. Expedited processing may be pursued in the following situations:

1.    Military Deployment.

2.    Age-out cases not covered by the Child Status Protection Act and applications affected by sunset provisions such as the Diversity Visa Program.

3.    Compelling reasons provided by the requesting office such as critical medical conditions.

4.    Loss of Social Security benefits or other subsistence at the discretion of the Director.

17.    To my knowledge, Plaintiff has not made a formal request for expedited processing. Moreover, U.S. Citizenship and Immigration Services (USCIS) will not routinely request the FBI to expedite a name check when the only reason for the request is that a mandamus (or other federal court petition) is filed in the case.

18.    USCIS reports the average processing times for specific applications and petitions on the USCIS website. This information reflects only average processing times on the date the information is published. Average processing times fluctuate widely and will sometimes even regress for a specific form time due to a number of factors, including a reallocation of agency resources, reordering of the agency's priorities, and other reasons. Additionally, not every application will require the same level of inquiry. Some may require a more detailed level of review and or investigation from either the USCIS or other agencies for a number of reasons ranging from the alien's eligibility for the benefit sought to national security concerns. Accordingly, even when it appears that the adjudication of a particular application is outside the average processing time, this does not establish that the delay is unreasonable or even due to factors within the control of the agency.

19.    There is no statutory or regulatory time limit for the adjudication of N-400s.  Moreover,
       during the continued pendency of a naturalization application, the alien retains all of the
       rights and benefits of a permanent resident of the United States, including the right to live
       and work in this country and to travel freely abroad.  Thus, applicants for naturalization
       are not as adversely affected by delays in the adjudication of their applications as are
       aliens filing for other immigration benefits.

20.    In my capacity as Supervisory Center Adjudication Officer of the CSC, I have access to
       the official files and records of the USCIS.  I have reviewed the system records for
       plaintiff Zheng LU, A77 843 438 .  Plaintiff LU is a native and citizen of China.    His
       status was adjusted to that of a Lawful Permanent Resident (LPR) of the United States on
       June 18, 2001.  On April 21, 2006, he filed the instant N-400 Application for
       Naturalization with the California Service Center.  On May 12, 2006 a name check
       request was sent to the FBI.  As of today's date, the name check for the plaintiff remains
       pending with the FBI.  On May 27, 2006 the results of the Plaintiff's FBI fingerprints
       check were received by USCIS.

21.    In accordance with 8 CFR § 335.2(b), in the absence of a "definitive response" from the
       FBI with regard to the name check request, the plaintiff may not be scheduled for a
       naturalization interview and his case remains in a holding status.

22.    Once the required security checks are completed, including the FBI name check,
       plaintiff's N-400 application will immediately be placed in the electronic queue to be
       scheduled for an interview in the District Office or the appropriate sub-office on the first
       available date in that location.  The CSC will also immediately transfer the A-file to the
       place where the interview will take place. In the event that the FBI eventually reports a
       "positive response" or "PR," significant additional time would likely be required while
       USCIS learns the precise nature of the positive information and determines whether it
       would have any bearing on the outcome of the adjudication.  Until such time as all

security checks are complete, USCIS is unable to complete the processing and adjudication of this N-400 application.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 15ᵗʰ day of May, 2008 at Laguna Niguel, California.


JANAKI RANGASWAMY
Supervisory Adjudication Officer
California Service Center

EXHIBIT 1

*Press Office*
**U.S. Department of Homeland Security**



# Fact Sheet

April 25, 2006

## Immigration Security Checks—How and Why the Process Works

**Background**

All applicants for a U.S. immigration benefit are subject to criminal and national security background checks to ensure they are eligible for that benefit.  U.S. Citizenship and Immigration Services (USCIS), the Federal agency that oversees immigration benefits, performs checks on every applicant, regardless of ethnicity, national origin or religion.

Since 2002, USCIS has increased the number and scope of relevant background checks, processing millions of security checks without incident.  However, in some cases, USCIS customers and immigrant advocates have expressed frustration over delays in processing applications, noting that individual customers have waited a year or longer for the completion of their adjudication pending the outcome of security checks.  While the percentage of applicants who find their cases delayed by pending background checks is relatively small, USCIS recognizes that for those affected individuals, the additional delay and uncertainty can cause great anxiety.  Although USCIS cannot guarantee the prompt resolution of every case, we can assure the public that applicants are not singled out based on race, ethnicity, religion, or national origin.

USCIS strives to balance the need for timely, fair and accurate service with the need to ensure a high level of integrity in the decision-making process.  This fact sheet outlines the framework of the immigration security check process, explaining its necessity, as well as factors contributing to delays in resolving pending cases.

**Why USCIS Conducts Security Checks**

USCIS conducts security checks for all cases involving a petition or application for an immigration service or benefit.  This is done both to enhance national security and ensure the integrity of the immigration process.  USCIS is responsible for ensuring that our immigration system is not used as a vehicle to harm our nation or its citizens by screening out people who seek immigration benefits improperly or fraudulently.  These security checks have yielded information about applicants involved in violent crimes, sex crimes, crimes against children, drug trafficking and individuals with known links to terrorism.  These investigations require time, resources, and patience and USCIS recognizes that the process is slower for some customers than they would like.  Because of that, USCIS is working closely with the FBI and other agencies to speed the background check process.  However, USCIS will never grant an immigration service or benefit before the required security checks are completed regardless of how long those checks take.

## How Immigration Security Checks Work

To ensure that immigration benefits are given only to eligible applicants, USCIS adopted background security check procedures that address a wide range of possible risk factors. Different kinds of applications undergo different levels of scrutiny. USCIS normally uses the following three background check mechanisms but maintains the authority to conduct other background investigations as necessary:

- **The Interagency Border Inspection System (IBIS) Name Check—** IBIS is a multiagency effort with a central system that combines information from multiple agencies, databases and system interfaces to compile data relating to national security risks, public safety issues and other law enforcement concerns. USCIS can quickly check information from these multiple government agencies to determine if the information in the system affects the adjudication of the case. Results of an IBIS check are usually available immediately. In some cases, information found during an IBIS check will require further investigation. The IBIS check is not deemed completed until all eligibility issues arising from the initial system response are resolved.

- **FBI Fingerprint Check—**FBI fingerprint checks are conducted for many applications. The FBI fingerprint check provides information relating to criminal background within the United States. Generally, the FBI forwards responses to USCIS within 24-48 hours. If there is a record match, the FBI forwards an electronic copy of the criminal history (RAP sheet) to USCIS. At that point, a USCIS adjudicator reviews the information to determine what effect it may have on eligibility for the benefit. Although the vast majority of inquiries yield no record or match, about 10 percent do uncover criminal history (including immigration violations). In cases involving arrests or charges without disposition, USCIS requires the applicant to provide court certified evidence of the disposition. Customers with prior arrests should provide complete information and certified disposition records at the time of filing to avoid adjudication delays or denial resulting from misrepresentation about criminal history. Even expunged or vacated convictions must be reported for immigration purposes.

- **FBI Name Checks—**FBI name checks are also required for many applications. The FBI name check is totally different from the FBI fingerprint check. The records maintained in the FBI name check process consist of administrative, applicant, criminal, personnel and other files compiled by law enforcement. Initial responses to this check generally take about two weeks. In about 80 percent of the cases, no match is found. Of the remaining 20 percent, most are resolved within six months. Less than one percent of cases subject to an FBI name check remain pending longer than six months. Some of these cases involve complex, highly sensitive information and cannot be resolved quickly. Even after FBI has provided an initial response to USCIS concerning a match, the name check is not complete until full information is obtained and eligibility issues arising from it are resolved.

For most applicants, the process outlined above allows USCIS to quickly determine if there are criminal or security related issues in the applicant's background that affect eligibility for immigration benefits. Most cases proceed forward without incident. However, due to both the sheer volume of security checks USCIS conducts, and the need to ensure that each applicant is thoroughly screened, some delays on individual applications are inevitable. Background checks may still be considered pending when either the FBI or relevant agency has not provided the final response to the background check or when the FBI or agency has provided a response, but the response requires further investigation or review by the agency or USCIS. Resolving pending cases is time-consuming and labor-intensive; some cases legitimately take months or even

**Immigration Security Checks—How and Why the Process Works**

several years to resolve.  Every USCIS District Office performs regular reviews of the pending caseload to determine when cases have cleared and are ready to be decided.  USCIS does not share information about the records match or the nature or status of any investigation with applicants or their representatives.

EXHIBIT 2



*Office of Communications*

**U.S. Citizenship and Immigration Services**

# News Release

April 2, 2008

### USCIS AND FBI RELEASE JOINT PLAN TO ELIMINATE BACKLOG OF FBI NAME CHECKS

*Partnership Establishes Series of Milestones To Complete Checks*

WASHINGTON – U.S. Citizenship and Immigration Services (USCIS) and the Federal Bureau of Investigation (FBI) today announced a joint plan to eliminate the backlog of name checks pending with the FBI.

USCIS and the FBI established a series of milestones prioritizing work based on the age of the pending name check.  The FBI has already eliminated all name check cases pending more than four years.

"This plan of action is the product of a strong partnership between USCIS and the FBI to eliminate the backlogs and to strengthen national security," said USCIS Director Emilio Gonzalez.

By increasing staff, expanding resources, and applying new business processes, the goal is to complete 98 percent of all name checks within 30 days. USCIS and the FBI intend to resolve the remaining two percent, which represent the most difficult name checks and require additional time to complete, within 90 days or less.  The goal is to achieve and sustain these processing times by June 2009.

The joint plan will focus on resolving the oldest pending FBI name checks first.  USCIS has also requested that the FBI prioritize resolution of approximately 29,800 pending name checks from naturalization applicants submitted to the FBI before May 2006 where the naturalization applicant was already interviewed.

The target milestones for processing name checks are:

| Completion Goal | Category |
|---|---|
| May 2008 | Process all name checks pending more than three years |
| July 2008 | Process all name checks pending more than two years |
| Nov. 2008 | Process all name checks pending more than one year |
| Feb. 2009 | Process all name checks pending more than 180 days |
| June 2009 | Process 98 percent of all name checks within 30 days and process the remaining two percent within 90 days. |

– USCIS –

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ZHENG LU,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL MUKASEY,<br>et al.,<br><br>Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No: C08-01569 JF

## DECLARATION OF MICHAEL A. CANNON

Michael A. Cannon, pursuant to 28 U.S.C. § 1746, declares the following:

(1)    I am currently the Section Chief of the National Name Check Program Section ("NNCPS") at the Headquarters of the Federal Bureau of Investigation ("FBI") in Washington, D.C. I have held that position since March 7, 2005.

(2)    In my current capacity as Section Chief, I supervise the National Name Check Units. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)    Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the policy and the procedures of the United States Citizenship and Immigration Services ("USCIS"). Specifically, I am familiar with the name check request for Zheng Lu, the plaintiff in this civil action.

## NATIONAL NAME CHECK PROGRAM

(4)    The National Name Check Program ("Program") has the mission of disseminating information from the FBI's Central Records System in response to requests submitted by federal agencies, congressional committees, the federal judiciary, friendly foreign police and intelligence agencies, and state and local criminal justice agencies. The Central Records System ("CRS") contains the FBI's administrative, personnel, and investigative files. The Program has its genesis in Executive Order No. 10450, issued during the Eisenhower Administration. That executive order addresses personnel security issues and mandates National Agency Checks as part of the pre-employment vetting and background investigation process for prospective Government employees. The FBI performs the primary National Agency Check conducted on all United States Government employees. From this modest beginning, the Program has grown exponentially, with more and more customers seeking background information from FBI files on individuals before bestowing a privilege, such as Government employment or an appointment, a security clearance, attendance at a White House function, a "green card" or naturalization, admission to the bar, or a visa. More than 70 federal, state, and local agencies regularly request FBI name searches. In addition to serving our regular Government customers, the FBI conducts numerous name searches in direct support of the FBI's counterintelligence, counterterrorism, and homeland security efforts.

### EXPLANATION OF THE CENTRAL RECORDS SYSTEM

(5)    The FBI's CRS enables the FBI to maintain all information which it has acquired in the course of fulfilling mandated law enforcement responsibilities. The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files

2

compiled for law enforcement purposes. This system consists of a numerical sequence of files broken down according to subject matter. The subject matter of a file may relate to an individual, organization, company, publication, activity, or foreign intelligence matter. Certain records in the system are maintained at FBI Headquarters. Records which are pertinent to specific FBI Field Offices are mostly maintained at those Field Offices.

(6)    FBI Headquarters and each Field Division can access the CRS through the FBI's General Indices. The General Indices are arranged in alphabetical order and consist of indices on various subjects, including the names of individuals and organizations. Only the information considered pertinent, relevant, or essential for future retrieval is indexed.

(7)    Communications directed to FBI Headquarters from various Field Offices and Legal Attaches are filed in the pertinent case files and indexed to the names of individuals, groups, or organizations which are listed in the case captions or titles as subjects, suspects, or victims. Searches made in the index to locate records concerning particular subjects are made by searching the name of the subject requested in the index.

(8)    The entries in the General Indices fall into two categories:

(a)    "main" entries – entries that carry the name corresponding with the subject of a file contained in the CRS.

(b)    "reference" entries – entries (sometimes called "cross-references") that generally only mention or reference an individual, organization, etc., that is contained in a document located in another "main" file.

(9)    In 1995, the FBI implemented the Automated Case Support ("ACS") system for its Headquarters, Field Offices, and Legal Attaches. More than 105 million records were converted from automated systems previously utilized by the FBI. The ACS system

3

consists of the following three automated applications that support case management functions for all investigative and administrative cases:

(a) Investigative Case Management: This application provides the ability to open, assign, and close investigative and administrative cases as well as to set, assign, and track leads. A case is opened by the Office of Origin, which sets leads for itself and other field offices, as needed. The offices that receive the leads are referred to as Lead Offices. When a case is opened, it is assigned a Universal Case File Number, which is utilized by FBI Headquarters and all offices conducting or assisting in the investigation. Using fictitious file number "111-HQ-12345" as an example, an explanation of the Universal Case File Number is as follows: "111" indicates the classification for that specific type of investigation; "HQ" is the abbreviated form used for the Office of Origin of the investigation (in this case, FBI Headquarters); and "12345" indicates the individual case file number for that particular investigation.

(b) Electronic Case File: This application serves as the central electronic repository for the FBI's official text-based documents. It supports the universal serial concept, where only the creator of a document serializes it into a file, providing single source entry of serials into the computerized system. All serials originated by the Office of Origin are maintained in the Office of Origin's case file.

(c) Universal Index: This application, sometimes referred to as "UNI", continues the universal concepts of the ACS system by providing a complete subject/case index to all investigative and administrative cases. Only the Office of Origin is required to index. However, the Lead Offices may index additional information as needed. The Universal Index, which consists of an index of approximately 98.9 million records, functions to index names to cases, and to search names and cases for use in the FBI investigative and administrative cases. Names of individuals or entities are recorded with identifying information such as the date or place of birth, race, sex, locality, social security number, address, or date of event.

(10)   The decision to index names other than subjects, suspects, and victims is a discretionary decision made by the investigative FBI Special Agent, the supervisor in the field division conducting the investigation, and the supervising FBI Special Agent at FBI Headquarters. The FBI does not index every name in its files, but indexes only that information considered pertinent, relevant, or essential for future retrieval. Without a "key" (index) to this mass information, information essential to ongoing investigations could not be readily retrieved. The FBI files would thus be merely archival in nature and could not be effectively used to serve one of the mandated missions of the FBI, to investigate violations of federal criminal statutes. Therefore, the General Indices to the CRS files are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter.

(11)   When the FBI searches a person's name, the name is electronically checked against the FBI's Universal Index. The searches seek instances of the individual's name, social security number, and dates close to his or her date of birth, whether a main file or reference. As previously stated, any "main" file name would be that of an individual who is, himself or herself, the subject of an FBI investigation, whereas any "reference" would be an individual whose name appears as part of an FBI investigation. For example, "references" include associates, witnesses, or conspirators. Additionally, there may be a myriad of other reasons to explain why an FBI Special Agent conducting an investigation believed it important to include a particular name in the FBI's index for later recovery. The names are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with only the first and last names, first and middle names, and so on. The Program

5

application searches names phonetically against the Universal Index records and retrieves similar spelling variations (which is especially important considering that many names in our indices have been transliterated from a language other than English).

(12)     If there is a match with a name in a FBI record, it is designated as a "Hit," meaning that the system has stopped on a possible match with the name being checked. If a search comes up with a match to a name and either a close date of birth or social security number, it is designated an "Ident."

## RESOLUTION RATE

(13)     There are four stages involved in the completion of an individual name check: batch processing, name searching, dissemination, and file review. The first stage in the process, batch processing, involves the transfer of the name check requests from USCIS to the NNCPS on magnetic tapes. Each tape can hold up to 10,000 names. (Some requests are transmitted via facsimile or verbally via telephone.) The tapes are uploaded into an FBI system and the names are electronically checked against the FBI's Universal Index (UNI). Recently, during the batch processing phase, approximately 66 percent of the name checks submitted by USCIS are returned to USCIS as having "No Record" within 48-72 hours. A "No Record" indicates that the FBI's Universal Index database contains no identifiable information regarding a particular individual. A "No Record" result returned to USCIS definitively concludes the name check process concerning that particular request. Duplicate submissions (i.e., identically spelled names with identical dates of birth and other identical information submitted while the original submission is still pending) are not checked, and the duplicate findings are returned to USCIS within 48-72 hours.

6

(14)    The second stage in the process is name searching. For the name check requests that are still pending after the initial electronic check, an expanded manual name search is required. An FBI employee in the NNCPS physically enters the applicant's name into the computer database searching different fields and information. This secondary manual name search completed typically within 30-60 days historically identifies an additional 17 percent of the USCIS requests as having "No Record," for an approximate 83 percent overall "No Record" response rate. The results of this 17 percent also are returned to USCIS.

(15)    The third and fourth stages in the process are dissemination and, if needed, file review. (Prior to February 2008, the file review stage preceded the dissemination stage. Because an increasing number of name check requests involve review of electronic records, and in an effort to improve efficiency, the FBI now uses the file review function in the back end of processing to locate paper records on an as needed basis.) As noted, the remaining 10 percent of USCIS requests are identified as possibly being the subject of an FBI record. Analysts in dissemination are responsible for reviewing and analyzing FBI records and providing results to customers. If a record was electronically uploaded into the FBI's ACS electronic record-keeping system, it can be reviewed quickly. If not, however, the relevant information must be retrieved through the file review process from an existing paper record. Once the information is retrieved, an analyst in dissemination reviews the records for possible derogatory information. Less than one percent of USCIS's requests are identified with a file containing possible derogatory information. If appropriate, the FBI forwards a summary of the derogatory information to USCIS.

(16)     Apart from the aforementioned stages, a name check occasionally may undergo additional electronic or manual searches depending on the length of time the name check has been pending in the processing queue in the dissemination phase. It is very common for a name check to remain pending in this final stage for an extended period because of the volume of earlier-filed name checks, as well as expedited name checks, that analysts must resolve. During this period, a name check cannot be further processed until it is assigned to an analyst. The additional searches thus are done to ensure that the analyst in the dissemination phase has up to date information prior to completing and disseminating a name check result.

(17)     At each stage of processing, the NNCPS generally works on the oldest name checks first – a first-in, first-served protocol. This protocol reflects that all applicants are equally deserving and ensures that all applicants are treated fairly. However, if an applicant's name check requires a review of numerous FBI records and files, even though that name check request came in first, the name check may require additional time until all responsive records are located and reviewed.

(18)     The general exception to the first-in, first-served policy exists when USCIS directs that a name check be handled on an "expedited" basis. Based on its own criteria, USCIS determines which name checks are to be expedited. Once designated as an "expedite," that name check proceeds to the front of the queue along with other prioritized name check requests, in front of the others waiting to be processed.

(19)     Expedited service allows USCIS to allocate name checks toward its highest priorities and generally to minimize possible health and welfare harm to applicants that may arise while an application is pending. However, the FBI limits the number of expedite

8

requests it will accept from USCIS consistent with available resources and personnel, as well as because only a limited number of applications can be expedited for the process to remain meaningful as too many expedited requests would merely reorder the queue and lead to no net benefit. Thus, as it does with most customers, the FBI limits USCIS to 100 expedite requests per week.

(20)    Another exception to the first-in, first-served policy is a near-term effort agreed to by USCIS and the FBI to reduce the number of pending USCIS name check requests by prioritizing "single hit" name checks. This key initiative is explained in paragraph (32) below.

## GROWTH OF THE NAME CHECK PROGRAM

(21)    Prior to September 11, 2001, the FBI processed approximately 2.5 million name check requests per year. As a result of the FBI's post-9/11 counterterrorism efforts, the number of FBI name checks has grown. For fiscal year 2007, the FBI processed in excess of 4 million name checks.

(22)    A significant portion of the incoming name checks submitted over the past few years has been submitted by USCIS. In fiscal year 2003, 64% (approximately 3,929,000) of the total incoming name checks were submitted by USCIS; in fiscal year 2004, 46% (~1,727,000) of the total incoming name checks were submitted by USCIS; in fiscal year 2005, 45% (~1,512,000) of the total incoming name checks were submitted by USCIS; in fiscal year 2006, 45% (~1,633,000) of the total incoming name checks were submitted by USCIS; and in fiscal year 2007, 52% (~2,113,000) of the total incoming name checks were submitted by USCIS.

## USCIS NAME CHECK REQUESTS

(23)    In November 2002, heightened national security concerns prompted a review of the former Immigration and Naturalization Service's ("INS's") procedures for investigating the backgrounds of individuals seeking immigration benefits. It was determined that deeper, more detailed clearance procedures were required to protect the people and the interests of the United States effectively. One of the procedures identified was the FBI's name check clearance. Before November 2002, only those "main" files that could be positively identified with an individual were considered responsive to the immigration authorities name check requests. Because that approach ran a risk of missing a match to a possible derogatory record, the FBI altered its search criteria to include "reference" files as well. From a processing standpoint, this meant the FBI was required to review many more files in response to each individual background check request.

(24)    In December of 2002 and January of 2003, the former INS resubmitted 2.7 million name check requests to the FBI for background investigations of all individuals with then-pending applications for immigrations benefits for which the Immigration and Nationality Act required background investigations. Those 2.7 million requests were in addition to the regular submissions by the former INS. Currently, the FBI has returned an initial response to all 2.7 million resubmitted requests. Moreover, although many of the FBI's initial responses to those resubmitted requests indicated that the FBI had no information relating to the specific individual who was the subject of the request, approximately 16 percent – or over 440,000 – resubmitted requests indicated that the FBI may have information relating to the subject of the inquiry. The FBI ultimately completed those 440,000 requests by the Spring 2008.

10

(25)    There are numerous factors that have contributed to delays in the processing of name check requests, including the name check for plaintiff. One is the volume of incoming name checks – the total volume of incoming name check requests combined with pending name check requests has historically outpaced the NNCPS's available resources to process this volume. As it concerns submissions by USCIS, for fiscal year 2007, USCIS submitted approximately 2,113,600 name check requests, of which approximately 1,112,400 represented naturalization-related name checks and approximately 794,800 represented adjustment of status-related name checks. As of the end of fiscal year 2007, the NNCPS had over 402,800 pending USCIS name check requests, of which over 167,000 represented naturalization-related name checks and over 197,900 represented adjustment of status-related name checks.

(26)    The number of "hits" on a name when it is reviewed may further contribute to a delay in processing a name check request. A "hit" is a possible match with a name in an FBI record. The number of times the name appears in FBI records correlates to the number of records which require review.

(27)    The processing of common names also contributes to a delay in processing a name check request. The names associated with a name check request are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with just the first and last, first and middle, and so on. Without detailed information in both the file and agency submission, it is difficult to determine whether or not a person with a common name is the same person mentioned in FBI records. Common names can often have more than 200 hits on FBI records.

11

(28)    The accessibility of the FBI record needed for review also contributes to a delay in processing a name check request. If the date of the record predates October 1995, the paper record has to be located, retrieved, and reviewed; if the date of the record is later than October 1995, the record text may or may not be available electronically depending on the type of record and whether it has been uploaded electronically. A paper record could be at one of over 265 possible locations across the country. Requests often involve coordinating the retrieval and review of files from the various 56 different FBI field offices. One person's name check may involve locating and reviewing numerous files, all at different physical locations. Each request must be communicated internally from the NNCPS to the field, and handled according to the current priorities of the particular field office. Since it is a paper based process, it is a process subject to misplaced or misfiled files. The process is time consuming and labor intensive.

(29)    Another contributing factor which was briefly mentioned earlier in this declaration is the expedited request. Processing an expedited case means that an employee is not available to work on a normal name check request.

## THE NATIONAL NAME CHECK PROGRAM IS ADDRESSING THE FACTORS THAT CONTRIBUTE TO DELAYS IN PROCESSING A NAME CHECK

(30)    The FBI is seeking a number of improvements to its process. Over the short-term:

(31)    NNCPS is continuing to develop the Name Check Dissemination Database ("NCDD"), an electronic repository for name check results, to eliminate manual and duplicate preparation of reports to other Agencies, and provide avenues for future automation of the name check process.

12

(32)    NNCPS is partnering with other Agencies to provide contractors and personnel to process name checks. For example, the FBI and USCIS have implemented a key initiative to use contractor resources to prioritize the processing of "Single-Hit" USCIS Name Check requests, that is, pending name check requests that have only one FBI file potentially identified with it that needs to be reviewed in order to process the request. By applying contractor resources to process these "Single Hit" requests, the FBI may significantly reduce the pending USCIS name check workload.

(33)    The FBI is using overtime to maximize productivity. It is also in the process of hiring additional employees to fill current vacancies and has procured an employee development program to streamline the training of new employees, thereby significantly decreasing the amount of time needed before a new employee can begin to significantly impact the NNCPS workload. The employee development program led to the development of a name check employee training manual.

(34)    NNCPS, through the Records Management Division's Records Automation Section, is scanning the paper files required for review in order to provide machine readable documents for the Dissemination Database. It is also building an Electronic Records System that allows for future automation of the name check process.

(35)    NNCPS is working with customers to streamline incoming product and to automate exchange of information.

(36)    As a mid-term improvement, NNCPS is exploring technology updates to the name check process. Specifically, the FBI procured textual analysis software in order to investigate ways to further automate the name check process. The goal is to incorporate

13

analytical software applications that reduce the time spent to verify the identity of the individual and, once verified, assists in the adjudication analysis. This type of automation should decrease the time required to process a name check, thereby increasing production. The FBI is building a proof of concept system for eventual integration into the FBI's core databases.

(37)    As a long-term improvement, the FBI is developing a Central Records Complex that will create a central repository of records. Currently, paper files/information must be retrieved from over 265 locations throughout the FBI. The Central Records Complex will address this issue, creating a central repository-scanning of documents, and expediting access to information contained in billions of documents that are currently manually accessed in locations throughout the United States and the world. In addition, the essential long term improvement for FBI Name Checks is to adjust the fee schedule to reflect the actual cost of providing name check services. Once in place, the FBI will be able to scale resources proportionally with workload demands – pending name checks will pay for themselves. Until recently, fees did not cover the basic costs of providing the service. The FBI procured services to conduct a study to determine an appropriate fee structure. The independent contractor hired to conduct the study has completed its work and the proposed fee structure is undergoing the Federal rulemaking process. Consistent with this process, on October 1, 2007, the FBI began charging increased fees up front on an interim basis.

(38)    The FBI cannot provide a specific time frame for completing any particular name check submitted by USCIS. The processing of name checks, including those which are expedited at the request of USCIS, depends upon a number of factors, including where in the processing queue the name check lies; the workload of the analyst processing the name

check; the volume of expedited name checks the analyst must process for, among others, military deployment, "age-outs," sunset provisions such as Diversity Visa cases, compelling reasons such as critical medical conditions, and loss of Social Security or other subsistence; the number of "hits," (i.e., possible matches) that must be retrieved, reviewed and resolved; the number of records from various Field Offices that must be retrieved, reviewed and resolved; and, more generally, the staff and resources available to conduct the checks. Unfortunately, the proprietary software NNCPS utilizes to process name checks does not report where in the processing queue a particular name check request may lie vis-à-vis other name checks.

(39)     The FBI and USCIS have developed a joint business plan to address the currently pending USCIS name checks. The plan forecasts the processing of name checks depending on the age and the resources available to NNCPS now and proposed for the future. Under the plan, NNCPS's current priority per USCIS is to focus upon pending naturalization name checks submitted to the FBI prior to May 2006, which NNCPS estimated was approximately 29,800 name checks as of January 2008; in addition to focusing on USCIS name checks pending with the FBI for more than two years. Once those are completed, the NNCPS will redirect its personnel resources to focus on the oldest pending name checks regardless of type. The ultimate goal of the business plan is by June 2009 to process USCIS name checks at a level of 98% within 30 days or less of receipt. The remaining 2% represent the most difficult name checks and require additional time to adequately complete. Notwithstanding, and absent extraordinary circumstances, NNCPS hopes to process the remaining 2% of USCIS name checks at a level of 100% within 90 days or less of receipt. Because name checks vary in their complexity and time to process, this forecast is an estimate and may be reassessed as

circumstances dictate. While the FBI is sensitive to the impact of the delays in processing name check requests, the consequence of the FBI's mission on homeland security requires that its name check process be primarily focused on providing accurate and thorough results.

(40) When the name check is completed, the FBI provides the results to USCIS as quickly as possible. On occasion, depending on the results provided to USCIS by the FBI, USCIS may require additional followup and coordination with the FBI.

(41) It is important to note that the FBI does not adjudicate applications for benefits under the Immigration and Nationality Act. If appropriate, the FBI generally provides a summary of available information to USCIS for its adjudication process.

## THE FBI DOES NOT PUBLICLY DISCLOSE NAME CHECKS RESULTS

(42) Plaintiffs occasionally request access to the documents examined during their name checks. The FBI does not publicly disclose name check results or any underlying "hits" because to do so could alert plaintiffs and/or other individuals to the existence of pending investigations, thus potentially compromising those investigations, confidential sources or investigative techniques. Through channels developed in the FBI's name check process, the FBI discloses derogatory information only to USCIS before USCIS renders final decisions on applicants' petitions. Moreover, the FBI cannot confirm that name check results reveal a person is *not* the subject of an FBI investigative record, because a denial as to one person would imply that silence as to others should be taken as confirmation that they are of investigative interest.

## PLAINTIFF'S NAME CHECK REQUEST

(43)   The name check request for plaintiff Zheng Lu was received by the FBI from USCIS on or about May 12, 2006. Plaintiff's name initially was electronically checked against the FBI's Universal Index on the same day, and resulted in "hits," indicating a possible match with FBI record(s) residing in various field offices and/or FBI Headquarters. A secondary manual name search was conducted on plaintiff's name on or around October 26, 2006, after which plaintiff's name still appeared to be associated with an FBI record(s). A preliminary manual file review to locate paper files and to determine whether files are germane to plaintiff's name also was conducted on or before November 2, 2007, after which plaintiff's name check request was sent to the dissemination phase. The name check request for plaintiff Zheng Lu is pending in the normal course of processing in the dissemination phase in accord with the first-in, first-served protocol described in paragraph (17) above. The results of the name check will be forwarded to USCIS in Washington, D.C., in due course, in accordance with the FBI's normal protocol.

17

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this *23* day of May 2008.

_____

MICHAEL A. CANNON
Section Chief
National Name Check Program Section
Records Management Division
Federal Bureau of Investigation
Washington, D.C.

18